**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| **EMILY DOE** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 1:25-cv-1513** |
| | ) | |
| **TEXAS CHRISTIAN UNIVERSITY** | ) | |
| **Serve: Registered Agent:** | ) | |
| **Victor J. Boschini, Jr.** | ) | |
| **3101 Bellaire Drive North** | ) | |
| **Suite 3200** | ) | |
| **Fort Worth, TX 76129** | ) | |
| | ) | |
| **Defendant,** | ) | |
| | ) | |

## COMPLAINT

Plaintiff Emily Doe ("Emily") states the following claims against Texas Christian University ("TCU").

### Nature of the Case

1. On October 6, 2024, a student at Texas Christian University ("TCU") raped fellow student Emily Doe in her TCU dorm room.
2. On February 20, 2025, TCU held an all-day hearing on Emily's complaint. Associate Dean of Students **David Cooper** and Assistant Dean of Students **Jeremy Steidl** served as "Procedural Chair" for the hearing. Justice **R. Malcolm Graham**, Ret., served as "Panel Chair." Three TCU employees chosen by TCU—**Annie Cowden**, Director - BNSF Neeley Leadership; Dr. **Christine Hall**- Assistant Professor of Professional Practice; and Dr. **Jay Iorizzo**, Director - Campus Recreation—served as panel judges. During the hearing, Emily

was repeatedly required to relive the rape in front of many strangers and subjected to cross-examination by five different questioners.

3. At the conclusion of the hearing, the panel found unanimously that the accused rapist did in fact rape Emily. The outcome was inevitable from the overwhelming evidence of his guilt.

4. At the time, TCU knew that rape and other sexual assault was rampant on the TCU campus and had been for years. *TCU's own legally required records under Title IX show there are dozens of reported rapes on campus every single semester, that very few of the reported rapes are even investigated, and that almost none of them result in punishment.*

5. TCU has long known that college men rape their fellow students and that the men do it because they think they can get away with it. And it has long known that, to protect its female students, TCU would have to impose a significant negative consequence, i.e., punishment, for a male student found to have raped a female.

6. Despite this knowledge, TCU imposed no real punishment at all on the rapist. Instead, it gave him homework--write a 3-4 page paper on the importance of mutual consent and discuss it, in private, with a TCU faculty member. And rewatch the short videos on consent he had been required to watch in orientation just six weeks before raping Emily. TCU also decided to move him to another dorm, without warning to the residents therein.

7. This case concerns TCU's gross violation of Title IX in adopting and enforcing a policy of imposing no real consequence on male students who rape fellow female students. Rather than protect female students from being raped, TCU adopted a policy to protect male students who rape. The policy is designed to create the illusion for female students of protecting them by compliance with Title IX, while not offending the male students who rape or the parents who pay more than $82,000 per year for their sons to attend TCU. The

de facto policy is, “Boys will be boys, and we can’t let a moment of poor judgment that results in rape ruin a boy’s life, regardless of how it affects the girl’s.”

8. This policy is the very definition of discrimination and of deliberate indifference to the school’s Title IX obligation to take reasonable steps to protect students from rape. Far from protecting female students from rape, TCU’s policy is substantially certain to **encourage** TCU men to rape TCU women.

9. Unless a court finds TCU in violation of Title IX and awards serious damages for the violation, the institution will not change. It will continue to observe the tacit rule of “at least one free rape” for each male student, which was applied in Emily’s case.

**Jurisdiction and Venue**

10. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367(a). This case raises a question of federal law under Title IX.

11. This Court has personal jurisdiction over TCU under the Virginia Long-Arm Statute, Va. Code § 8.01-328.1(A)(1) and (2), and venue is permitted in this Court under 28 U.S.C. § 1391(b)(1) and (2). TCU regularly sends representatives to Virginia to recruit students. In this case, TCU reached into Virginia to recruit Emily, enticed her to choose TCU by offering a scholarship to her in Virginia, and knowingly made the false representations to her in Virginia that TCU complies with Title IX and takes its Title IX obligations seriously.

12. Courts have discretion to allow proceeding anonymously where privacy or confidentiality concerns are at stake. *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993). All five factors that the Fourth Circuit articulated as relevant to this analysis favor anonymity. *Id.*

13. This litigation involves matters that are highly sensitive and of a personal nature, and identification of Plaintiff would pose a risk of retaliatory physical harm to her.

14. Plaintiff's experience has been deeply psychologically traumatic, and public knowledge of such abuse is likely to trigger new trauma even years after the fact.
15. In addition, Plaintiff is in college and about to embark on her career.
16. The action involves private parties, and there is no unfairness to the other party.
17. Plaintiff would face a very real risk of harassment, ridicule, and personal embarrassment were she to proceed under her name.

**Background**

18. Title IX bars any educational institution receiving federal funding from discriminating on the basis of sex against any person in the United States. Sexual discrimination is defined to include sexual assault, which includes rape.
19. Title IX's regulatory scheme, relevant case law, and the common law make clear that prohibiting such discrimination includes an obligation to take reasonable steps to protect students from discriminatory tortious acts of other students, especially rape.
20. In October 2024, Emily and the rapist were both students at TCU. Before October 6, 2024, they had met one time when they were paired at a formal dinner hosted by the rapist's fraternity. This complaint will refer to the rapist as "Bob," a pseudonym, because it is not about what he did; it is about what TCU did and did not do after Emily reported the rape.
21. On October 5, 2024, Emily went with girlfriends to a bar in Fort Worth.
22. At the bar, she ran into Bob. They talked for a while, and, when the bar was about to close at 2:00 a.m., they shared an Uber back to the dormitory they both lived in on TCU's campus.
23. Emily made the mistake of thinking Bob to be an honorable person; she invited him into her room. They made out for a while. Then Bob said he had to go to the bathroom,

which was down the hall. Before leaving the room, he turned to Emily and said, "Don't fall asleep. Don't fall asleep before I get back."

24. By that time, it was after 3 a.m. The room was dark—the lights were off and there is only one small window admitting light from outside. Having been awake since 9:15 the previous morning and having consumed some alcohol, Emily immediately fell asleep—she lost consciousness.

25. Emily is a heavy sleeper. Given the hour and the alcohol, she did not wake up or regain consciousness when Bob came back into the room sometime later. As he did this, Bob had to see that she was asleep or unconscious because she was facing the door and the light from the hallway would have illuminated her face when he re-entered the room.

26. Emily's bed was only 39 inches wide. It was a loft bed, and the top of the mattress was five feet off the ground. Bob carefully climbed up onto the bed, crawled over Emily, and positioned himself behind Emily without waking her up.

27. In a conversation recorded only hours after the rape, Bob admitted, and the TCU panel found, that he neither sought nor received her consent. He admitted there was zero verbal communication between Emily and him after he returned from the bathroom. He admitted there was no display of affection between them. Instead, without a word or a gesture from her or him, and, without protection against pregnancy or sexual transmission of disease, he proceeded to penetrate her with his penis while she was not conscious.

28. Emily awoke to Bob raping her. She screamed at him to get out and he left. Sobbing and shaking, she immediately called, by FaceTime, her two best friends to tell them what had just happened. She then immediately called TCU's sexual assault hotline. Too traumatized to attend class, she called her mother, told her what happened, and left school several days early to go home to Virginia for TCU's fall break.

29. While in Virginia, because the rape had been unprotected sex, Emily went to a physician to be tested for sexually transmitted disease and for pregnancy. She also saw a therapist to deal with the trauma she had experienced and was still experiencing.

30. On October 15, 2024, when Emily returned to TCU after fall break, she filed a formal complaint with TCU's Title IX office. A true and accurate copy of the complaint (personal identifying information redacted to protect the victim and witnesses), is attached as **Exhibit A**. Shortly thereafter she met with TCU's Title IX investigator, Angelica Ramirez, for an in-person interview where she described the rape in detail.

31. The evidence confirming the rape was overwhelming. Emily had immediately reported the rape to witnesses and to the sexual assault hotline. The witnesses said she was sobbing and shaking as she recounted the rape. Most damning of all, Bob had admitted in a recorded conversation the same day as the rape that he had neither sought nor obtained her consent.

32. Although there were only a few witnesses for TCU's Title IX investigator to interview, and each interview would take only a few minutes, the investigator showed no interest in pursuing the matter. Inexplicably, knowing that witnesses' memories fade quickly, especially for events they were not personally involved in, TCU just sat on Emily's complaint and did nothing about it. When more than a month had passed without the investigator calling Emily's witnesses, Emily engaged outside counsel.

33. On November 22, 2024, a full five weeks after Emily had filed her complaint, Emily's counsel wrote to the investigator, **Angelica Ramirez**, as well as to TCU's then-chancellor, **Victor J. Boschini, Jr**., its then-president (now chancellor), **Daniel W. Pullin**, its general counsel, **Lee Tyner**, its supposed Title IX coordinator, **N. Friesema** (falsely listed on TCU's website although no person was actually in that role), and its

director of the Office of Institutional Equity, **Sharon Gooding**, and demanded action. Only then did TCU bother to start to do anything on Emily's case.

34. Only after receiving that letter and a phone call from Emily's counsel did TCU call Emily's witnesses, some six weeks after Emily had filed her complaint.

35. In retaliation for Emily's counsel's complaining about her own and TCU's cavalier approach to her complaint, Ramirez then called Emily in for a second in-person interview by both Ramirez and Gooding. Ramirez and Gooding pointlessly humiliated Emily by forcing her to recount and relive the rape once again and then suggesting that maybe the rape was her fault. In this second interview, Ramirez and Gooding seemed to revert to a 1950's treatment of a rape victim—was she wearing a suggestive outfit, how thin were her shoulder straps, was she wearing underwear, how much had she had to eat that day, and, repeating the same questions asked in the first interview, exactly how much had she had to drink—as if the real problem here was not that Bob knowingly penetrated Emily without her consent while she was not conscious, but that Emily's manner of dressing and acting meant that she must have wanted him to do it and given tacit consent.

36. In a written report issued February 25, 2025 (**Exbibit B** hereto, redacted), five days after the all-day hearing, the TCU hearing panel formally and unanimously found the following: "The Respondent [Bob] penetrated the Complainant's vagina with his penis, without her consent, while she was lying in bed in her dormitory room, unaware that sexual activity was occurring." Ex. B at 5. This finding constitutes rape.

37. Incredibly, after finding him guilty of rape, TCU refused to punish the rapist. He was not required to miss a single day of school, to make any kind of reparation, or even to apologize. And TCU made sure that nothing about his offense of non-consensual sexual intercourse, i.e., rape, will ever appear on any record of his time at TCU.

38. Emily appealed the “remedy” imposed by TCU because it was grossly disproportionate to the offense. (**Exhibit C**, redacted.) TCU waited more than a month before **Michael Russel,** Vice-Chancellor of Student Affairs, denied the appeal stating, “the remedies were sufficient to achieve the educational [sic] goals of the process.” (**Exhibit D**, redacted.) There is no avenue of further appeal within TCU.

39. Two weeks after the panel’s announcement of its finding that Bob raped Emily, a TCU student whom Emily had never met, accosted Emily in a public place on TCU’s campus and screamed at her in front of numerous other students that she was a “fucking bitch” and a “whore” because of the accusations she had made against his “best friend” (i.e., Bob).

40. TCU transferred Bob, the man who had admitted his rape more than six months earlier, to another dormitory—like the Catholic Church quietly moving a rapist priest from the parish where he raped and is known to another where he is unknown and can continue to rape.

41. Upon information and belief, TCU has for years followed this policy of not punishing rapists. This policy and TCU’s actions in this case constitute an intentional indifference to its Title IX obligations and to the known danger of nonconsensual sex to Emily and other students, especially other female students.

42. TCU’s Board of Trustees’ reports, made available on its website, show that the university recorded 564 official reports of sexual assault-rape between August 15, 2020, and December 31, 2024. The records demonstrate that TCU launched formal investigations in less than 5 percent of those 564 cases.

43. During the Fall Semester of 2024 at TCU, there were 64 reports of sexual assault-rapes. According to TCU's own data, only three of these cases were formally investigated by TCU, and none resulted in disciplinary action.

44. No reasonable person would think that the non-punishment doled out to Bob by TCU was an appropriate consequence for a male student who was found to have raped his fellow female student, nor would any reasonable person think that such a "punishment" would do anything whatsoever to deter would-be rapists.

45. Instead, TCU's policy makes TCU's Title IX procedures, from complaint through hearing, entirely illusory. A rape victim is encouraged to go through the entire process not knowing what TCU knows—that even if the rapist is found guilty, there will be no real consequence, so the entire process (including all of the pain, anguish, anxiety, humiliation and trauma of having to relive the rape through countless retellings to strangers) is utterly pointless.

46. TCU knows, as any reasonable person would know, that this policy of non-punishment actually ***encourages*** rape because male students at TCU know that nothing will happen to them for raping TCU's female students. Based on Bob's case, men at TCU who want to have sex with a non-consenting TCU female will say to themselves, "I'll pretend she consented. It will be my word against hers. She might decide she's OK with it. Or she might not file a complaint because she'll learn that nothing will come of it. But, even if she complains, and even if I'm found guilty, ***nothing will happen to me***."

**COUNT I – VIOLATION OF TITLE IX**

47. Plaintiff repleads the foregoing paragraphs.

48. TCU has long been obligated by Title IX to act to protect students from sexual discrimination and not to act in a deliberately indifferent manner regarding sexual discrimination against its students.

49. Before Emily accepted her scholarship and began her freshman year at TCU, TCU had actual knowledge from both oral reports and written complaints from students that sexual assault, including nonconsensual sexual intercourse (rape), of its female students was a severe and pervasive problem on campus.

50. Through its indifferently slow, designed-to-humiliate investigative process and its grossly inadequate remedies, TCU was deliberately indifferent twice over regarding sexual discrimination against Emily.

51. TCU's treatment of the known problem of sexual assault of its female students has for years communicated to TCU's male students that TCU will not take nonconsensual sexual intercourse seriously and that there will be no real consequence for male students at TCU who engage in such conduct.

52. TCU's violation of Title IX described above proximately caused severe damage to Emily.

**<u>COUNT II – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>**

53. Plaintiff repleads the foregoing paragraphs.

54. TCU knew to a moral certainty that its years-long policy of deliberate indifference to nonconsensual sexual intercourse (rape) and its cavalier treatment of female students who complain of being raped, would result in more TCU women being raped. It was not a question of *whether* TCU's policies would result in more rapes, but only *who* would be the unfortunate female students to suffer the consequences of that indifference.

55. TCU knew that its deliberate indifference would inflict severe emotional distress on the female students who suffered rape as a result of such indifference. This means TCU

intended to inflict such harm. *Reed Tool Co. v. Copelin*, 689 S.W.2d 404, 406 (Tex. 1985).

56. Emily suffered severe emotional distress as a direct result of TCU's indifference to rape in general and to her rape in particular.

57. By imposing no real punishment on the student found unanimously to have raped her, TCU sent a loud, unmistakable message to Emily: "It does not matter that you were raped."

58. As Emily stated in her fruitless appeal (**<u>Exhibit C</u>** hereto, redacted) of the ludicrous remedy, "Can you imagine how worthless the panel's judgment made me feel?"

59. TCU knew that having already suffered rape and been required to relive it over and over again through TCU's Title IX process, Emily was emotionally fragile when TCU issued its ruling. And TCU knew that not to punish the man found to have raped Emily would severely traumatize and damage her, hitting her like a second rape.

60. TCU's deliberate indifference caused Emily to suffer severe anxiety, a pervasive sense of fear and lack of control, depression, inability to concentrate, severely disturbed sleep (including insomnia and nightmares), humiliation, shame, mood swings, post-traumatic stress disorder, and a distrust of others, especially men, that make it harder to have a normal, loving relationship with others.

61. While some of these conditions may improve with time, the emotional harm from rape does not go away. Emily will carry it for the rest of her life.

62. TCU's actions in encouraging the rape of its female students were willful and wanton and in reckless disregard of the rights of those females, including Emily. TCU adopted and followed its rape-encouraging policy because it values male students more than female students, and because not offending the rapists and their families serves to increase

TCU's revenues.  These revenues allow TCU to continue to pay its men's football and basketball coaches more than $10 million per year, and to pay millions of dollars to TCU's executives to continue to cover up the university's Title IX violations.

63. The TCU employees most involved in this travesty, especially those in authority who knew the facts, had the opportunity to correct the injustice, but did nothing, should resign or have their employment terminated involuntarily. This includes especially now-Chancellor, then-President, **Daniel W. Pullin**, Deans **David Cooper** and **Jeremy Steidl**, and Associate Vice-Chancellor for Student Affairs **Michael Russel**.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter judgment against TCU as follows:

a. Compensatory damages in the amount of $50,000,000;
b. Punitive damages in the amount of $50,000,000;
c. A permanent injunction requiring TCU to comply with Title IX, to treat cases of alleged rape seriously, to acknowledge explicitly that nonconsensual sex is rape, to interview the complainant's witnesses within two weeks of filing of the complaint, to expel or suspend for at least one year any student found guilty of rape, and to note it permanently on a student's transcript if he is found guilty of rape;
d. Reimbursement of Plaintiff's costs, legal expenses, and attorney's fees incurred in connection with this matter; and
e. Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Dated: September 10, 2025

Respectfully submitted,

EMILY DOE

By: /s/

Thomas M. Wolf, Esq. (VSB # 18234)
Joseph M. Rainsbury, Esq. (VSB # 45782)
Clarissa K. Pintado, Esq. (VSB #86882)
O'Hagan Meyer, PLLC
411 E. Franklin Street; Suite 500
Richmond, VA 23219
Telephone: (804)361-4551
Facsimile: (804) 237-0250
Twolf@ohaganmeyer.com
jrainsbury@ohaganmeyer.com
cpintado@ohaganmeyer.com

Alison C. Duffy, Esq. (VSB #90113)
O'Hagan Meyer, PLLC
2560 Huntington Ave, Suite 204
Alexandria, VA 22303
P: (703) 775-8606
aduffy@ohaganmeyer.com

*Counsel for Plaintiff*